IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION

| | | |
|---|---|---|
| Bor-Tyng Sheen | ) | Case: 1:24-cv-02400 |
| Cheng-Yu Wei | ) | Assigned To : McFadden, Trevor N. |
| Fung I Yuan | ) | Assign. Date : 8/19/2024 |
| Tzu-Kuan Lin | ) | Description: Pro Se Gen Civ. (F-DECK) |
| Wen-Wang Yang | ) | |
| Yi-Pei Shih | ) | |
| | ) | **COMPLAINT** |
| | ) | |
| Petitioners in Pro Se, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GOVERNMENT OF | ) | |
| THE UNITED STATES OF AMERICA | ) | |
| | ) | |
| Respondent. | ) | |

PARTIES TO THIS COMPLAINT

I.      The Petitioners

a.   Standing: as a part of the "intended" third-party beneficiaries of 1950 USA-UNGA Trusteeship Agreement, Petitioners have Article III Standing protected under the Constitution of the United States.

Petitioners are six "non-refugee stateless persons" of a total of 18 million stateless Formosan population living within the decolonized territorial boundary of

Complaint    Page 1 of 33

RECEIVED

AUG 1 9 2024

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

"Formosa and the Pescadores" to which U.S. jurisdiction apply. Petitioners raise a "juridical procedure matter of the Charter of the United Nations" concerning the stateless Formosan population's fundamental human rights and fundamental freedom as a matter of a U.S. Trust that has been entrusted to the American jurisprudence for 72 years since the Treaty of Peace with Japan entered into force on April 28, 1952. In fact, the Government of the United States continues to hold "all right, title, and claim to Formosa and the Pescadores" on behalf of the non-refugee stateless Formosan population that gives rise to Petitioners' course of Formosan justice an Article III standing in this Court of Justice under the Article VI mandate of the Constitution of the United States.

The "Trustee-Beneficiaries" relationship between the Parties involved in this case is established under the 1950 US-UNGA Trusteeship Agreement in which the UN General Assembly is the High Contracting-Parties who also hold the juridical power over "the Formosan Item" and who hold the supervisory power of issuing Mandates accordingly. The "Government-Individual" relationship of the Parties involved in this case is determined by the U.S. Public Law 4 and Public Law 96-8 for which the public laws serve a governmental function (i.e., the "principal occupying Power" of the occupied Formosa designated under the Article 23 of the Treaty of Peace with Japan) for justice administration of the stateless Formosan population (i.e., a people who have yet to achieve "a full-measured self-government" on their home territory), because the provisional administration known as "Taiwan/Taiwan-governing-authorities/the Chinese Taipei" is "a non-sovereign and a non-government entity" on the occupied Formosa according to the U.S. congressional Bill: 1979 Taiwan Relations Act (TRA).

b.    Legal Condition: arising from the status of "Non-Refugee Stateless Persons", Petitioners hold the inhabitants' claim right over the deprived "right to statehood" under U.S. human rights treaties.

The Government of the United States of America is obligated to preserve the census record of the Petitioners and all other 18 million inhabitants (non-refugee) of Formosa under the Chapter two, 2b of 1951 Treaty of Peace with Japan for which the respective treaty was written in principle of *uti possidetis juris* (UPJ) and in respect to the legal concept of "inchoate title" by Mr. John Foster Dulles.

Pursuant to the 1954 Convention Relating to the Status of Stateless Persons (i.e., a human rights treaty), Petitioners have acquired a "Status of Statelessness"— *"non-refugee stateless persons as a distinct population of persons of concern"* —- to claim the inhumane condition of the stateless Formosan population as injuries resulting from the fiduciary's deprivation of the third-party beneficiaries' "right to statehood" in terms of the designate Administering Power's deprivation of stateless Formosan population's fundamental human rights and the designate Juridical Power's impediment of stateless Formosan population's fundamental freedoms.

c.    Legal Identity: Petitioners have a "protected right" to exist as "the non-refugee stateless Formosans of the occupied Formosa" under occupation laws.

Although having lived under the control of U.S.-Taiwan (principal-agent) in relationship on the occupied Formosa, Petitioners are neither nationals of "the principal occupying Power" (U.S.A.) nor nationals of "Taiwan/the Republic of China" pursuant to the Article 4 of the 1949 Fourth Geneva Convention (GCIV): "*protected persons are the population their land is occupied.*" Pursuant to the Article 8 of the GCIV: No

Renunciation of Rights, Petitioners bear a duty to honor the law determined "protected right" to declare that "non-refugee stateless persons" of Formosa *owe no allegiance* either to Taiwan (the Republic of China) or to the United States (the "principal occupying Power"of the occupied Formosa designated under the Article 23 of the Treaty of Peace with Japan). Pursuant to the Article 47 of the GCIV- Inviolability of Rights, Petitioners' "benefits secured to them by the present Convention" shall not be deprived "*by any agreement concluded between the authorities of the occupied territories and the Occupying Powers*" including the 1979 Taiwan Relations Act (TRA). Accordingly, Petitioners' "right to exist" as non-refugee stateless Formosan persons shall not be deprived or be erased by such a provisional "occupation-by-proxy" format with the United States and Taiwan in principal-agent relationship on the occupied Formosa to which the U.S. jurisdiction apply.

d.  Cause of Action: fiduciary theory of jus cogens human rights in respect of the third-party beneficiaries' "equal rights" and "self-determination" under the UN Charter.

Under the UN Trusteeship System, non-refugee stateless Petitioners have a good cause of action in fiduciary abuse in terms of the Administering Power's deprivation of a treaty-based fundamental human rights and the Contracting State's impediment of a trust-based fundamental freedoms in respect to the High Contracting-Parties' Mandate of "Ending the Statelessness by 2024." Arising from the status of non-refugee statelessness status, Petitioners' right of action in this Court is coincided with the inviolable legal status of Formosa; where the operation of "occupation on a basis of trusteeship" continues to be governed under the 1950 US-UNGA Trusteeship Agreement; where it is an Article 77 non-strategic/non-self-governing trust territory

recognized under the <u>UN Charter</u>; and where a sacred Trust for the birth of a free Formosan Nation within the decolonized territorial boundary of "Formosa and the Pescadores" was established multilaterally under the Chapter two, 2b of the 1951 <u>Treaty of Peace with Japan</u>.

From the perspective of the "fiduciary theory of jus cogens", non-refugee stateless Formosan Petitioners exercise the third-party beneficiaries' inalienable rights (i.e., beneficiaries' undertaking the "sole-enforcer rule" in trust law) pertaining to all relevant U.S. human rights treaties to petition with this Court for resolving "a juridical procedure matter of the <u>UN Charter</u>" and a dispute involving the Parties' treaty rights and treaty obligations that are governed under Article VI of the <u>U.S. Constitution</u>. Therefore, Petitioners seek judicial remedy and injunctive relief upon (1) the principal occupying Power's non recognition of the 18 million non-refugee stateless Formosan population's "right to exist" must be addressed; (2) the Administering Authority's "owing a corresponding fiduciary duty" under the 1950 US-UNGA <u>Trusteeship Agreement</u> must be enforced; and (3) the juridical power's non compliance in bringing the statelessness issue of the Formosan population to meet with the High Contracting-Parties' Mandate of "Ending the Statelessness by 2024" bears judicially enforceable legal consequences.

Petitioner 1:
Name: Bor-Tyng Sheen
Residence: 5F, No.15-1, Ln 170, Minzu Rd. New Taipei City 220069, FORMOSA
Email: blakefg@gmail.com
Phone number: 011886-918176727
U.S. mailing address: 5709 Big Sandy Drive, Raleigh NC 27616-5751
U.S. contact phone number: (919) 758-9633

Petitioner 2:
Name: Cheng-Yu Wei
Residence: No.83, Minsheng Rd. Kaohsiung City 815001, FORMOSA

Email: a0955068951@gmail.com
Phone number: 011886-955068951
U.S. mailing address: 5709 Big Sandy Drive, Raleigh NC 27616-5751
U.S. contact phone number: (919) 758-9633


Petitioner 3:
Name: Fung I. Yuan
Residence: No.5-2, Ally 12, Ln.190, Sec.7, Zhongshan N. Rd. Taipei City 11030,
            FORMOSA
Email: sijoulee@gmail.com
Phone number: 011886-928970606
U.S. mailing address: 5709 Big Sandy Drive, Raleigh NC 27616-5751
U.S. contact phone number: (919) 758-9633


Petitioner 4:
Name: Tzu-Kuan Lin
Residence: No.25, Alley 3, Jhongyi Ln. Jhongsiao Rd. New Taipei City 220069, FORMOSA
Email: pinkpig@ms8.hinet.net
Phone number: 011886-916987029
U.S. mailing address: 5709 Big Sandy Drive, Raleigh NC 27616-5751
U.S. contact phone number: (919) 758-9633


Petitioner 5:
Name: Wen-Wang Yang
Residence: No.16, Ln 107, Taiping Rd. North Dist. Taichung City 404008, FORMOSA
Email: aa0929139602@gmail.com
Phone number: 011886-929139602
U.S. mailing address: 5709 Big Sandy Drive, Raleigh NC 27616-5751
U.S. contact phone number: (919) 758-9633


Petitioner 6:
Name: Yi-Pei Shih
Residence: No.1, Ln. 150, Sec.1,Jiankang Rd, Tainan City 700520, FORMOSA
Email: shihyipei@gmail.com
Phone number: 011886-919232020
U.S. mailing address: 5709 Big Sandy Dr. Raleigh NC 27616-5751
U.S. contact phone number: (919) 758-9633


II.    The Respondent


a.    Official Position: the "principal occupying Power" of the occupied Formosa
designated by the 1950 Treaty of Peace with Japan who  continues to operate the US-

UNGA mission of "occupation on a basis of trusteeship" through the U.S. President's Office in Taipei, Formosa.

As "a subject of law", Respondent holds the "juridical power" for safeguarding the juridical status of "Formosa and the Pescadores" the same as President Truman's "treaty-making authority" to The 1951 Treaty of Peace with Japan. Under the agent/ agency law, Respondent exercises the "principal occupying Power" in its overseeing the agent/agency "Taiwan/Republic of China/the Chinese armed group" on the occupied Formosa. Pursuant to the Article 23 of the respective peace treaty, Respondent oversees the daily "occupation on the basis of trusteeship" within the decolonized territorial boundary of "Formosa and the Pescadores" through a presidential Office in Taipei, Formosa the same as all former U.S. presidents since the end of WWII. That U.S. President's Office in Taipei, Formosa  has been re-named as "American Institute in Taiwan" (AIT), including a "Taipei Desk" of the Department of State in the operation, since the passage of the congressional Bill named as "1979 Taiwan Relations Act."

b.   Official Capacity: the "Administering Power" of the occupied Formosan population designated by the 1950 USA-UNGA Trusteeship Agreement who has treaty obligations to "care" and to "act" for the best interest of the third-party Formosan beneficiaries.

Pursuant to the Article VI of the U.S. Constitution, the sitting President of the United States of America has statutory duties to "carry out U.S. treaties in good faith…to uphold the sacred faith of U.S. treaties" in order to justify that Government of the United States of America continues to hold "all right, claim, and title to Formosa and the Pescadores" on behalf of the non-refugee stateless Formosan population.

Respondent has "juridical power" to trigger "the juridical procedure matter of the UN Charter" at the UN General Assembly upon resolving the statelessness issue of the occupied Formosan population the same as President Harry Truman's "agreement-making authority" to the 1950 USA-UNGA Trusteeship Agreement. Under the Trusteeship System of the UN Charter, Respondent has a corresponding fiduciary duty to act on behalf of the best interest of the third party beneficiaries of Article 77 trust territory Formosa. Respondent has a contractual duty to comply with all UNGA Mandates for advancing the US-UN mission of "colonies emerging States" including the entrusted "Formosa Item" under the Treaty of Peace with Japan. Respondent's fiduciary duty is non-derogable, because President Truman had surrendered "the full discretion of a trustee" to the supervisory board of the 5th Session of UN General Assembly (the High Contracting-Parties) upon the approval of the respective trusteeship agreement that implies specific "terms" with a clear "objective" of "Formosa's emerging as a State."

Under the human rights contract of the 1950 US-UNGA Trusteeship Agreement, the designated Administering Authority has treaty obligations to improve the inhumane situation of the occupied Formosan population and to seek "enforceable measures arising from fundamental human rights" for UNGA intervention, Respondent bears official duties as follows: (1) a fiduciary who preserves the census record of the third-party beneficiaries of the occupied Formosa designated by the Agreement; (2) a fiduciary who holds "all right, title, and claim to Formosa and the Pescadores" on behalf of the non-refugee stateless Formosan population; (3) a fiduciary who bears corresponding fiduciary duty to "forward" petitions submitted by the third-party beneficiaries from the "non-self-governing trust territory" Formosa to the UN General

Assembly for "examination and consultation" within a 2-month timeframe pursuant to Article 80 of the <u>UN Charter</u>; (4) the Contracting State/the juridical power must serve "to claim an action for the enforcement of an obligation" for the best interest of the stateless Formosan population at the UN General Assembly; and (5) the Contracting State must comply in good faith the High Contracting-Parties' Mandates, including the UN General Assembly's 10-year Mandate of "Ending the Statelessness by 2024."

c.   Official Title: the sitting President of the United States of America, who holds the "Juridical Power" deriving from the juridical status of "Formosa and the Pescadores" as "a subject of law", is the origin of this legal dispute.

Address: The White House of the United States of America<br>
1600 Pennsylvania Avenue N.W.,<br>
Washington, DC 20500, U.S.A.

Telephone number: (202) 456-1111

### AUTHORITIES

I.    <u>The Constitution of The United States of America</u>

Article II, Section 3. The U.S. Constitution confirms President's treaty-making authority and mandates that President "shall take Care that the Laws be faithfully executed."
Article III, Section 2, Clause 1. The judicial power shall extend to all cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made …to all cases affecting…foreign…subjects.
Article VI, Clause 2. The U.S. Constitution spells out the fact that a treaty is as much as a part of "the supreme Law of the Land" in which it expects any future President "to carry out U.S. treaties in good faith…to uphold the sacred faith of U.S. treaties."

II.    Treaties Made under the Authority of The <u>U.S. Constitution</u>

1. The <u>Charter of the United Nations</u>

On June 26, 1945, the Allies signed the world's first multilateral human rights treaty of the United States. The UN Trusteeship System/Council established under the Charter provisions is designated to carry out the American's decolonization Order for achieving: "colonies emerging as States."

Preamble of the UN Charter:

"to reaffirm faith in fundamental human rights, in the dignity and worth of the human person…to establish conditions under which justice and respect for the obligations arising from treaties and other sources of international law can be maintained."

Chapter XI: Declaration Regarding Non-self-Governing Territories.

All trust territories are in fact "non-self-governing territories" for whose peoples have not yet achieved a full-measured self-government.

Article 73 mandates that Administering Authorities of trust territories to "recognize the principle that *the interests of the inhabitants of these territories are paramount, and accept as a sacred trust* the obligation the utmost the well-being of the inhabitants to this end:…"

Chapter XII: International Trusteeship System (Rights and Obligations)

  The Administering Authority's fiduciary duty is bound by the norms of customary international Law.

Chapter XIII: The Trusteeship Council (Functions And Powers)

Article 85, 1. Trusteeship Agreements that subject to UNGA approval for non-strategic trust territories under Article 77 "alteration or amendment, shall be exercised by the General Assembly."

Article 87 b. accept petitions and examine them in consultation with the administering authority; d. take these and other actions in conformity with the terms of the trusteeship agreements.

2. 1949 The <u>Fourth Geneva Convention</u> (GCIV)

Part I  General Provisions

Article 4   Definition of Protected Persons: Persons protected by the Convention are those who at a given moment and in any manner whatsoever, find themselves, in case of a conflict or occupation, in the hands of a Party to the conflict or Occupying Power of which they are not national.

Article 6  In the case of occupied territory…the Occupying Power shall be bound, for the duration of the occupation, to the extent that such Power exercise the functions of government in such territory, by the provisions of the following Articles of the present Convention: 1 to 12, 27, 29 to 34, 47, 49, 51, 52, 53, 59, 61 to 77, 143.

Article 8    No-Renunciation of Rights: Protected persons may in no circumstances renounce in part or in entirely the rights secured to them by the present Convention.
Article 33  Reprisals against protected persons and their property are prohibited.

Section III Occupied Territories
Article 47  Inviolability of rights
Protected persons who are in occupied territory shall not be deprived, in any case or in any manner whatsoever, of the benefits of the present Convention by any change introduced, as the result of the occupation of a territory, into the institutions or government of the said territory, nor by any agreement concluded between the authorities of the occupied territories and the Occupying Power, nor by any annexation by the latter of the whole or part of the occupied territory.

3.  1950 USA-UNGA Trusteeship Agreement
On October 27, 1950, President Truman placed "the Formosa Item" on the agenda of UN General Assembly for its approval of Formosa's Article 77 non-strategic trust territory status under the UN Charter. The 1950 USA-UNGA Trusteeship Agreement for the Charter benefit of the Formosan people, in its designating the United States as the Administering Authority and the UN General Assembly as the High Contracting-Parties who hold the supervisory power over the United States' Administrating Authority regarding "the Formosan issue", was further approved by the 5th Session of the UN General Assembly under Article 2 of the UN Charter.

4.  1951 The Treaty of Peace with Japan
The negotiator Mr. John Foster Dulles applies uti possidetis juris (UPJ) principle and a legal concept of "inchoate title" in his drafting the peace treaty that serves the preservation of territorial boundaries for a future "colonies emerging as States."
Chapter II, Territory, Article 2, (b) Japan renounce all right, title and claim to Formosa and the Pescadores.
Chapter VII, Final Clauses, Article 23 (a) The present Treaty shall be ratified by the States which sign it…the United States of America as the principal occupying Power

5.  1952 Recognition of Treaty Unit of FORMOSA by the Universal Postal Unit Treaty System (UPU)
Upon the Treaty of Peace with Japan entering into force on 28 April1952, the inviolable legal status of Formosa as an Article 77 trust territory within the decolonized territorial boundaries of "Formosa and the Pescadores" is also been legally confirmed by the international mailing system: FORMOSA stands as a "territorial unit" and "a valid

address" to which "an international reply coupon" is available and recognizable within the UN Agency of Universal Postal Unit (UPU).

6. 1954 <u>Convention relating to the Status of Stateless Persons</u>
The Convention determines that "non-refugee stateless persons as a distinct population of persons of concern" have a legal status for claiming rights and benefits; "This Statelessness Convention provides practical solution for Administering States to address the particular needs of stateless persons that guarantee their security and dignity until their situation can be resolved."

7. 1961 <u>Convention on Reduction of Statelessness</u>
The Convention requires that the Administering States who bear treaty obligations in overseeing the benefit of (non-refugee) stateless populations to reduce the plight of stateless persons worldwide.

8. 1977 <u>Protocol Additional I to the Fourth Geneva Convention</u>
Article 4 - Legal Status of Occupied Territories
Neither the occupation of a territory nor the application of the Conventions and this Protocol shall effect the legal status of the territory in question.

## III.    U.S. Codes

Section 1331 of Title 28 of U.S. Code, civil actions concern U.S. Treaties and Agreements.
Section 3301 of Title 22 of U.S. Code, a jurisdictional grant by the Congress.
The Uniform Trust Code (2000), Trustee Communication & Beneficiaries Information

## IV.    Federal Rules
Federal Rules of Civil Procedure for Trust Discovery & Mediation
The Sole Enforcers Rule and Plain Meaning Rule in Trust Law
The Parol Evidences Rule in Contract Law

## <u>MEMORANDUM OF POINTS</u>

1.  In the name of that Chiang Kai-Shek's defeated Chinese nationalist forces (which was re-named as "Taiwan/governing authorities of Taiwan" by the 1979 Taiwan

Relations Act) needed a temporary shelter for CKS's "Republic of China" in exile, General MacArthur (the SCAF) defied President Truman's order — "keep out the Chinese military forces from Formosa"— by smuggling CKS's "Chinese armed group" ashore of the Allies occupied Formosa. On February 27, 1947, in counteracting to General MacArthur's defiance, President Harry Truman declared that "American determination is to prevent the capture of Formosa…Formosa is U.S. jurisdiction." Since then, the United States' legitimate right to exercise a complete jurisdiction within the decolonized territorial boundary of "Formosa and the Pescadores" stands as a matter of fact.

2.  In August 1949, the Truman Administration published the U.S.-U.N. The China White Paper, in which a distinctive differences between the term "Formosa" and "Taiwan" was drawn in accordance with the customary international law of the United States. In the China White Paper, Secretary of State Dean Acheson defined the relative position between "Formosa" and "Taiwan/the Republic of China", in view of the U.S. foreign policy and the world order set forth under the UN Charter, that "**Taiwan is as the provisional administration on Formosa"…[PPS53]…the removal of the present provisional administration is the only reasonably sure chance of denying "Formosa and the Pescadores" to People's Republic of China.**" In Chapter XI. Formosa 307-309 "The island is extremely productive…80% of the Formosans can read and write…**There were indications that Formosans would be receptive toward United States guardian-ship and the United Nations trustee-ship.**"

3.  As the UN Ambassador at Large under the Truman Administration, Mr. John Foster Dulles, has declared: "the Formosan Question remains as an emblem of American resolve" (Dulles memorandum paper, March 1950; FR document 775). On August 14, 1950 US-UN Formosa Neutralization. President Truman dispatched the U.S. Seventh Fleet to Formosa Strait to ensure that Formosa should not be used as a base of conflict operation against Mainland China (People's Republic of China) by Chiang Kai-shek's Chinese nationalist forces (a.k.a. Taiwan; the Republic of China; the Chinese armed group; the Chinese Taipei) on Formosa.

4.   Memorandum of Conversation, Subject Formosa. Mr. Dulles outlined U.S. position on Formosa regarding "the Formosan item": "the U.S. interest in the Formosan problem is a deep and legitimate one…in view of the United Nations Charter undertakings which override any inconstant engagements." (Dulles memorandum Oct 13, 1950)

5.   On October 27, 1950, President Truman brought "the Formosan Item" under Formosa's Article 77 trust territory status (i.e., non-strategic trust territory; non-self-governing trust territory) in its seeking the 5th Session of the UN General Assembly approval. Hence, the 1950 USA-UNGA   Trusteeship Agreement approved under the Article 2 of the UN Charter carries legal effects and implies legal consequences till today. As a reminder for the Formosan beneficiaries' undertakings in principles of "the equal rights" and "self-determination", President Truman declared that "the resolute fighters of the Formosan people are entitled to the realization of the Trusteeship." (the Truman Doctrine)

6.   On September 8, 1951, the Treaty of Peace with Japan was signed by the Allied Powers with Japan at the San Francisco Peace Conference, in which neither "Taiwan/ the Republic of China" (as "the provisional administration on Formosa" named by the Truman Administration) nor the People's Republic of China (P.R.C.) was allowed entry into signing the peace treaty for a reason that neither of the two divided Chinese military forces— "Taiwan/R.O.C." and "China/P.R.C."— were qualified as an Allied Power or as a Signatory State. In light of the Territory Item of "Formosa and the Pescadores" addressed in Article 2 (b) of the respective peace treaty, Mr. Dulles stated that "**the Title to "Formosa and the Pescadores" has been entrusted to the Signatory States to the Treaty of Peace with Japan…the future title is not determined by the Treaty… this is to be determined in due time taking the wishes of Formosan population into consideration…the Formosan issue is to be taking care of by the Charter of the United Nations.**" Questions regarding the Formosan people's future "technical" sovereignty, Mr. Dulles gave such an answer: "the realization of the Formosan people's fundamental human rights worth the struggle." (Dulles Doctrine)

7.  On Jan. 30, 1955, President Eisenhower signed the 'Formosa Measure' along the Formosa Strait to delineate US-UNGA Trusteeship Operation within the boundary of "Formosa and the Pescadores" from US-UNSC 'Operation Oracle' for a cease-fire agreement between Taiwan (R.O.C.) and China (P.R.C.) along the Chinese coastline of Taiwan's "Quemoy & Matsu" islands and the Mainland China. Upon explaining why the "Sino-American Mutual Defense Agreement" was to be included in President Eisenhower's [the Formosa Declaration], Secretary of State Mr. Dulles drew **a hard line along the Formosa Strait between "Formosa" and "Taiwan"** in light of the Supreme Clause Article VI of the U.S. Constitution by stating that "**the juridical status of Formosa and the Pescadores is different from the juridical status of the off-shore islands Quemoy & Matsu…Nothing in the present treaty shall be construed as affecting or modifying the legal status or the sovereignty of the territories in Article VI.**" (House Committee Report, May 4, 1955)  (see Attachment/page 31 of 33)

8.  In 1979, the United States made a decision to switch its diplomatic recognition from "Taiwan/the Republic of China" to People's Republic of China (P.R.C.) by enacting a congressional Bill known as the Taiwan-Relations-Act (TRA), in which the application does *not* extend itself to reach Taiwan's home territory: Quemoy & Matsu islands.

9.  The Visa Waiver program (VWP) is not applicable to Taiwan's home territory: Quemoy and Matsu islands; the VWP is only applicable to residences living within the decolonized territorial boundaries of "Formosa and the Pescadores."

## BASIS FOR VENUE

Respondent's Oval Office where the Administering Authority's principle place of administering the 1950 USA-UNGA Trusteeship Agreement is located in District of Columbia, USA. Arising from the third-party beneficiaries position designated by the

respective trusteeship agreement, Petitioners have a proper venue pursuant to the U.S. P.L.4 and P.L. 96-8 with a jurisdictional grant by the U.S. Congress under 22 U.S.C. 3301 stating that "For all purposes, including actions in any court in the United States, the Congress approves the continuation in force of all treaties and other international agreements, including multilateral conventions, entered into by the United States…"


## BASIS FOR JURISDICTION

I.    Extraterritorial Jurisdiction

Due to the ultimate objective of the 1950 USA-UNGA Trusteeship Agreement is yet to be achieved, the "all right, title, and claim to Formosa and the Pescadores" that divested from the former colonizer Japan by the 1951 Treaty of Peace with Japan continues to be held by the treaty's Depository: the Government of the United States of American. The "principal occupying Power" of "the Formosa Item" continues to operate in real time through the U.S. President's Office in Taipei Formosa known as the "American Institute in Taiwan" that is described as "a nonprofit corporation incorporated under the laws of the District of Columbia." Thus, this U.S. Federal Court for the District of Columbia has acquired an extraterritorial jurisdiction over a matter of U.S. Trust arising from the occupied Formosa (Formosa and the Pescadores) under the mandate of Article VI of the U.S. Constitution.

II.    Personal Jurisdiction

Due to the 1950 USA-UNGA Trusteeship Agreement continues to govern a sacred U.S. Trust at issue and the Agreement attempts to give this Court an exclusive

jurisdiction over any relevant legal dispute, this Court's personal jurisdiction over the Parties involved in this civil action can find evidence from the following legal facts:

1.   This Court is "the last resort" for the disadvantaged Petitioners arising from the occupied Formosa to access justice. Petitioners' legal status of "non-refugee stateless Formosan persons" and the resulting non-derogable human rights (i.e., the right to claim injuries and the right to demand fiduciary duty in U.S. courts) is well supported by one very simple truth of that the Government of the United States is in a bind to hold "all right, title, claim to Formosa and the Pescadores" on behalf of the stateless Formosan population until the objective of the 1950 USA-UNGA Trusteeship Agreement can be accomplished.

2.   Respondent's Oval Office in the White House, where the records pertaining to the 1950 USA-UNGA Trusteeship Agreement, pertaining to the 1951 Treaty of Peace with Japan, and pertaining to the census record of non-refugee stateless Formosan inhabitants of the occupied Formosa are kept, is within the geographic area of the District of Columbia, U.S.A.

3.   Respondent's Trust Power discretion is subject to the Article II, Section 3. and the Article VI, Clause 2. of the Constitution of the United States of America that allow no bad-faith discretion over a sacred U.S. Trust established multilaterally.

4.   Respondent's Administering Authority position in respect to the UNGA's supervisory position over the trusteeship issue raised is bound by "the fiduciary theory of jus congens" of the UN Charter; and Respondent's juridical power deriving from the juridical status of "Formosa and the Pescadores" is subjected to jus cogens rule.

5. Respondent's undertaking principal occupying Power position on the occupied Formosa through the U.S. President's Office in Taipei, Formosa (American Institute of Taiwan) is subjected to the federal peremptory norms which allow no derogation.

6. Congress has enacted a statute which waives the Government's immunity for a case concerning non-monetary relief.


III. Subject- Matter Jurisdiction

This Court has acquired sufficient subject-matter jurisdictions from both 28 U.S.C. 1331 and 22 U.S.C. 3301 to oversee a trustee-beneficiaries dispute arising from 'a juridical procedure matter of the UN Charter' that has actual impacts on American national interests and on the collective interests of the UN General Assembly.

1. Original Subject-Matter Jurisdiction under 28 U.S.C. 1331

This Court has original subject-matter jurisdiction over a matter of U.S. treaties (i.e., the UN Charter; the USA-UNGA Trusteeship Agreement; the Treaty of Peace with Japan; 1954 and 1961 Statelessness Treaties; the Fourth Geneva Convention and the Additional Protocol to GCIV) arising from the occupied Formosa where the sitting U.S. President exercises "occupation on a basis of trusteeship" as the "principal occupying Power", as the "Administering Power", and as the "Juridical Power." Thus, this Court has original jurisdiction over a U.S. Trust in dispute under the 28 U.S.C. 1331 deriving from (1) Article VI of the U.S. Constitution mandates that matters arising under U.S. treaties all Judges in every state shall be bound thereby; (2) The Federal Courts shall have original jurisdiction over all civil action arising under the U.S. Constitution, customary international law, or treaties of the United States; and (3) Article III, Section 2, Clause 1:

"The judicial power shall extend to all cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made or which shall be made; to all cases affecting…foreign…subjects."

2.  Jurisdictional Grant by the Congress under 22 U.S.C. 3301

This Court has subject-matter jurisdiction over a matter of U.S. customary international law from which the U.S. Public Law 4 and Public Law 96-8 give rise to a congressional grant of civil statute under 22 U.S.C. 3301 for the Petitioners, who are "non-refugee stateless persons as a distinct population of concern" arising from a "non-self-governing trust territory" Formosa to which the U.S. jurisdiction apply, to access justice "for all purpose…in all U.S. courts." Thus, this Court is in a position as *federal courts are empowered to hear a case that have been entrusted to them by a jurisdictional grant by Congress*" under the Section 3301 of Title 22 of the United States Code. Under the federal peremptory norm, this Court's federal question jurisdiction over a U.S. Trust at issue in terms of Respondent's "owing a corresponding fiduciary duty" and Petitioners' "non-derogable human rights to demand a fiduciary duty" in respect to the 1950 USA-UNGA Trusteeship Agreement is consistent with the legal notion that "the primary purpose of federal question jurisdiction is to ensure the availability of a forum designed to minimize the danger of hostility toward, and specially suited to the vindication of, federal created rights." (15 Moore's Federal Practice 103.03)

STATEMENT OF CLAIMS


Undertaking President Truman's mandate: "the resolute fighters of Formosa are entitled to the realization of trusteeship", stateless Formosan petitioners launched three rounds of petitions during the Trump Administration (e.g., petition the U.S. Congress in 2017 for the benefit of the UN Charter; petition the U.S. Secretary of State in 2018 for participating in the US-UNGA  mission at hand: "statelessness ending"; petition with U.S. federal court of EDNC in 2020 for establishing "conditions under which justice and respect for the obligations arising from treaties can be maintained" (Sheen et al., v. USA; case 5:20-cv-00225-M)) with no success in challenging the status quo. However convoluted the logic of "keeping the occupied Formosan population under the control of US-Taiwan in principal-agent relationship" and the logic of 'maintaining the situation of Sino-American subjugation on the occupied Formosa" may be, the stateless Formosan beneficiaries' duty to take charge of one's own destiny through the "realization of the trusteeship" must continue, as long as the Government of the United States continues to hold "all right, title, and claim to Formosa and the Pescadores" under the <u>Treaty of Peace with Japan</u>, as a sacred Trust guaranteed by the <u>U.S. Constitution</u>.

On May 16, 2022 Pacific time, [Petition for Trustee Communication], which contained fifty-five signatures signed by fifty-five non-refugee stateless Formosan persons including all six Petitioners to this civil action, was submitted to the sitting U.S. President Mr. Joseph Biden from Taipei, FORMOSA to the White House in Washington D.C. U.S.A. through a UPS overnight mail with a tracking number # 5889 9045 775. In that [Petition for Trustee Communication], petitioners asked President Biden to conduct

a timely review over the statelessness situation of the Formosan population; to give a voice to the disadvantaged stateless Formosan persons; and to "forward the petition to the UN General Assembly for examination and consultation" upon the statelessness situation of the Formosan population in its applicability of "Ending Statelessness by 2024" Mandate. However, at this moment of court filing, two years and three months have past since that Petition had been delivered to the White House on May 17, 2022, 9:35 AM, Petitioners have received no information regarding the Formosan case's applicability to that UNGA mission at hand, no response from the Biden Administration, and no Hearing has been granted either by the White House in D.C. or by President Biden's Office of American Institute of Taiwan (AIT) in Taipei, Formosa.

Considering there is only four more months left for President Biden (as the only qualified juridical power over "the Formosan issue" within the entire UN Trusteeship System) to uphold the corresponding fiduciary duty on behalf of the best interests of the third party beneficiaries of the 1950 USA-UNGA Trusteeship Agreement; and there is only four months left for President Biden to comply with the High Contracting-Parties' Mandate of "Ending the Statelessness by 2024" (i.e., a 10-year Mandate issued in 2014 by the UN General Assembly to all Administering Authorities of the remaining non-strategic/non-self-governing trust territories) by bringing in "the Formosan Item" for a UNGA review; Petitioners turn to this Court's judicial power for settling a U.S. Constitution dispute over a juridical procedure matter of the UN Charter. Thus, arising from the third party beneficiaries' non-derogable human rights to "demand a fiduciary duty" and a complaint for the sitting U.S. President's "owing corresponding fiduciary duty" under both the 1950 Trusteeship Agreement and the 1951 Treaty of Peace with

Japan, Petitioners claim injuries resulting from the fiduciary' "inaction" in four categories of allegation: violations of constitutional norm of pacta sunt servanda; violations of peremptory norm of the UN Charter; violations of jus cogens human rights; and violations of the peremptory norm of human rights law and international humanitarian laws (IHL) as follows.

Claim I
Violations of Constitutional Norm of *Pacta Sunt Servenda*
1.   The factual allegations within are included as if fully set forth herein.
2.   Arising from an existing USA-UNGA Trusteeship Agreement in its operating an "occupation on a basis of trusteeship" over the stateless Formosan population under the UN Charter, Respondent's non-compliance of the High Contracting-Parties' "Ending the Statelessness by 2024" Mandate constitutes a violation of constitutional norm of *pacta sunt servanda* set forth in both Article II and Article VI of the U.S. Constitution.
3.   Arising from the Trust Power's holding the "right, title, and claim to Formosa and the Pescadores" for the benefit of the stateless Formosan population under the Treaty of Peace with Japan, Respondent's non-compliance of the High Contracting-Parties' "Ending the Statelessness by 2024" Mandate constitutes a violation of constitutional norm of *pacta sunt servanda* set forth in both Article II and Article VI of the U.S. Constitution.


Claim II
Violations of Peremptory Norm of the Charter of the United Nations
4.   The factual allegations within are included as if fully set forth herein.
5.   Arising from the Article 80 of the UN Charter, Respondent's inaction of forwarding 'the Petition for Trustee Communication' to the High Contracting-Parties for examining the Formosan case's applicability the UNGA Mandate of "Ending the Statelessness by 2024" constitutes a violation of peremptory norm of "petition of right" set forth by the "terms" of the 1950 USA-UNGA Trusteeship Agreement.

6.  Arising from the Article 80 of the UN Charter, Respondent's inaction of exercising the corresponding fiduciary duty of ending the statelessness issue of the Formosan population constitutes a violation of peremptory norm of "equal footing on petition of right" between the Administering Authority and the third party beneficiaries under the High Contracting-Parties' Mandates.

7.  Arising from [UNGA, examination of petitions, A/RES/435, 2 December 1950], Respondent's inaction in granting a hearing as pleaded in the 'Petition for Trustee Communication' submitted from the USA-UNGA occupied Formosa constitutes a violation of peremptory norm of the UN Charter for which the Administering Authority's corresponding fiduciary duty between "the Petitioners' expressing a special interest arising from trust territory Formosa" and "the High Contracting Powers' Mandate to end Statelessness" is governed by a peremptory norm which allows no derogation; and for which the Respondent's "full discretion of a Trust Power" has been "surrendered" to the High Contracting-Parties upon the approval of the respective trusteeship agreement.


Claim III

Violations of *Jus Cogens* Human Rights

8.  The factual allegations within are included as if fully set forth herein.

9.  Arising from self-executing trusteeship provisions of the Article 87(b) and Article 87 (d) of the UN Charter, Respondent's inaction of exercising the corresponding fiduciary duty toward the non-refugee stateless Formosan petitioners' plea for the "Statelessness Ending" Mandate of the High Contracting-Parties constitutes a violation of third party beneficiaries' *jus cogens* human rights in "terms" of the 1950 USA-UNGA Trusteeship Agreement.

10. Arising from [UNGA, examination of petitions,A/RES/435, 2 December 1950], Respondent's inaction of exercising the corresponding fiduciary duty to "forward" the 'Petition for Trustee Communication' or to "make recommendation" upon the statelessness issue of the Formosan people as pleaded, on May 17, 2022, to the High Contracting-Parties of the respective trusteeship agreement "within two months of their receiving such petitions…submitted from people of the trust territory" constitutes a violation of *jus cogens* human rights of the third party beneficiaries.

11.    Arising from [UNGA, examination of petitions, A/RES/435, 2 December 1950], Respondent's inaction in granting a hearing to the non-refugee stateless Formosan petitioners as pleaded in the 'Petition for Trustee Communication' constitutes a violation of *jus cogens* human rights of the third party beneficiaries arising from Article 77 trust territory Formosa in which the USA-UNGA "occupation on a basis of trusteeship" is still on-going. In order for "the right of petition" to be understood as a jus cogens human rights, the UNGA Resolution mandates that "Considering that the right of petition, which is one of the most important factors in the operation of the international Trusteeship System…Considering that it is essential, in the interest of the inhabitants of Trust Territories to continue to improve in every possible way the procedure for the examination of petition.

Claim IV

Violations of The Peremptory Norm of Human Rights Law and International Humanitarian Laws

12.  The factual allegations within are included as if fully set forth herein.

13.    Respondent's inaction in responding to the inhumane situation of the "protected people" of the occupied Formosa on appeal constitutes the principal occupying Power's violation of Article 4 of the Fourth Geneva Convention (GCIV): In case of occupation, individual protected persons' "rights of communication" shall not be deprived by the principal Occupying Power.

14.  The Respondent's inaction in co-operation with the High Contracting-Parties of the relevant Trusteeship Agreement in terms of UNGA Mandate of "Ending the Statelessness by 2024" constitutes the principal occupying Power's non-compliance of "Co-operation with the United Nations" under the Article 89 of the 1977 Protocol Additional to the GCIV.

15.    The Respondent's taking no actionable measure to improve the occupied Formosan people's "non-refugee statelessness" situation constitutes a violation of peremptory norms of 1954 Statelessness Convention, which entails the principal occupying Power's treaty commitment as to guarantee "their security and dignity until their stateless situation can be resolved." Further, Respondent's "inaction" violated the

norm of the 1961 Convention on the Reduction of Statelessness, which entails the requirement of Administering States of trust territories "to address the particular needs of stateless persons."


## STATEMENT OF FACTS


Since the end of World War II, the United States of America, as the principal founder of the UN Organization and as the leading drafter of the <u>Charter of the United Nations</u>, has transformed more than one-hundred-and-forty former colonies into UN Member States under the American post-war liberal world Order of "colonies emerging States." However, the treaty item of "Formosa" appears to be lost from the American cause of "fundamental human rights and fundamental freedoms for all" movement since General MacArthur brought Taiwan (a.k.a. the Republic of China; the Chinese Nationalist forces; the Chinese armed group; the Chinese Taipei) from mainland China to the Allies occupied Formosa in 1947. Today, Respondent continues to exercise the "occupation-by-proxy" format (i.e., a power sharing prescription between "the principal occupying Power" and the non-state Chinese agent/agency named as "Taiwan" by the 1979 Taiwan Relations Act) on the occupied Formosa through a provisional control mechanism of "Sino-American" subjugation in which the "inhabitants of Formosa" are treated as an *object* of the "Constitution of the Republic of China/Taiwan" and the "non-refugee stateless Formosan persons" are recognized as a foreign *subject* of the Constitution of the United States.

In fact, the dangerous and unfortunate situation of the occupied Formosan population for four generations remains as appalling as Mr. Dulles predicted: "dignity cannot be developed by those who are subject to alien control, however benign" (Mr. Dulles' speech at the San Francisco Peace Conference on Sep. 5, 1951). The plight of the stateless Formosan population being forced to conceal one's legal identity and being subjected to a prolonged "Sino-American subjugation" has caused sufferings in three aspects: (1) the non-refugee stateless Formosan population have been constantly blocked from developing a sense of "fundamental human rights, in the dignity and worth of the human person" secured to them by the UN Charter; (2) the occupied Formosan people have been constantly blocked from developing a desire for "a full-measured self-government" in order to defend Formosa's territorial integrity secured to them by the Treaty of Peace with Japan; and (3) the occupied Formosan population is being constantly subjected to live in perpetual fear of an impending Chinese civil-war for either "the two Chinas Unification" between Taiwan (the Republic of China) and Mainland China (People's Republic of China) or for Taiwan's war-of-independence on the occupied Formosa to which the U.S. jurisdiction apply.

No matter how inhumane the situation that the occupied Formosan population has been forced to endure for four generations, first and foremost, it is Petitioners who bear the burden of the third-party beneficiaries' responsibility, as "self-determination" required by the human rights treaty law and as "the sole-enforcer-rule" required by trust law, to rise in this Court of Justice and to prove that the purpose of a sacred U.S. Trust for a free Formosan Nation must prevail. Thus, in the context of court procedure for

reviewing a high-stake treaty matter at issue and a high-profile Respondent involved in the case, there are certain existing legal facts as follows for this Court to consider:

1.  It is because "the inchoate legal interests" of a sacred Trust for the birth of a free Formosan Nation is yet to be completed, the depository of the Treaty of Peace with Japan (the Government of the United States of America) continues to hold "all right, title, and claim to Formosa and the Pescadores" on behalf of the stateless Formosan population.

2. It is because the "objective" of 1950 USA-UNGA Trusteeship Agreement for the Formosan people to achieve a "full-measured self-Government" under the UN supervision is yet to be accomplished, the U.S. President's principal occupying Power Office in Taipei, FORMOSA (the American Institute in Taiwan (AIT)) remains fully functional and operational today.

3. The function and purpose of U.S. President's Office in Taipei, Formosa remain the same for eight decades because the UN General Assembly continues to supervise the juridical power's "occupation on a basis of trusteeship" on the occupied Formosa. The passage of 1979 Taiwan Relations Act (TRA) merely changed the name of that Office to "American Institute in Taiwan" and merely changed the name of "the Chinese armed group on Formosa" from the Republic of China to "Taiwan". The passage of TRA has no sequential impact upon the inviolable legal status of "the Formosa Item" and of "the Formosan Item" granted by all case related multilateral treaties. Nevertheless, the TRA defines the provisional agent/agency Taiwan as "a non-government entity" on the occupied Formosa.

4. As a matter of UN-UPU treaty system, FORMOSA is the only agreeable "legal address" of the Formosan people's residencies for where the "International Reply Coupon" is available and for where the Universal Postal Unit (UPU) has "international postal duty" to safeguard the said term bound by the legal effect of 1951 Treaty of Peace with Japan.

5. Due to "the juridical status of Formosa and the Pescadores is different from the juridical status of the off-shore islands Quemoy & Matsu" (Dulles Doctrine), this Court's judicial power over "the Formosan Question" raised under the trusteeship provisions of the UN Charter is well within the juridical status of "Formosa and the Pescadores." This Court's power to rule over a U.S. Trust in question is independent and outside of the Respondent's political stand over the "Taiwan-China issue" for which it is a political matter of the UN Security Council (UNSC) in respect of a preexisting cease-fire agreement along the Chinese coastline between the Chinese Mainland (China P.R.C.) and Taiwan's home territory "Quemoy and Matsu" islands to which the U.S. jurisdiction does not apply.

6. Due to "the Title to "Formosa and the Pescadores" has been entrusted to the Signatory States to the Treaty of Peace with Japan" (Dulles Doctrine) and the 1950 USA-UNGA Trusteeship Agreement continues to govern the remaining interest of the U.S. Trust for a free Formosan Nation, Respondent has been made to surrender the "full discretion of a Trustee" to this Court's judicial power of administering justice over a matter of human rights treaties raised by the third-party beneficiaries arising from the occupied Formosa.

7.  Due to the "Contracting State — High Contracting-Parties" relationship of the 1950 USA-UNGA <u>Trusteeship Agreement</u> was established under the Article 2 of the <u>UN Charter</u>, Respondent's owing a corresponding fiduciary duty to the stateless third-party beneficiaries and Respondent's owing a contractual compliance to the UNGA Mandate of "Ending the Statelessness by 2024" are both subjected to a norm of *jus cogens* ( i.e., "non-derogable and limited replace-ability") pursuant to the Article 53 of the <u>Vienna Convention on the Law of Treaties</u>.

## CONCLUDING STATEMENT

As the drafter of the U.S. Trust at issue has mandated that "*the Formosan Question remains as an emblem of American resolve*" (Dulles memorandum paper, March 1950; FR document 775), this course of Formosan justice raises a judicial question applicable to the Article VI mandate of the <u>U.S. Constitution</u>. Due to the 1950 USA-UNGA <u>Trusteeship Agreement</u> continues to govern the "inchoate legal interest" of a sacred U.S. Trust for the birth of a free Formosan Nation, the "due time" has come for the Parties involved in this case to honor the American Grantor's "intent" and to strive for an outcome that is legally sufficient to uplift the entire 18 million non-refugee stateless Formosan persons "as a distinct population of concern" high enough to reach the American Grantor's promise: a dignified Formosan statehood on Formosan people's sacred land: FORMOSA (Formosa and the Pescadores).

## REQUEST FOR RELIEF

WHEREFORE, the Petitioners request:

1.  For an Order to compel "Trustee-Beneficiaries Communication";

2.  For an Order to mandate Mediation;

3.  For an Order to compel trust Discovery under Federal Rules of Civil Procedure;

4.  For an injunctive relief. This Court to mandate that the Respondent must undertake "set an agenda" and "call for an extension" with the President of the UN General Assembly upon resolving the statelessness issue of the entire occupied Formosan population in conformity with the High Contracting-Parties' Mandate of "Ending the Statelessness by 2024."

5.  For an injunctive relief. This Court to mandate that the Respondent must keep the Petitioners "reasonably informed" regarding the progress of USA UNGA joint intervention or any enforceable fundamental human rights measure upon resolving the statelessness issue of the occupied Formosan population.

6.  For such other just order and further relief as this Court deems proper for this course of justice.

**Certification and Closing**

Under Federal Rule of Civil Procedure II, by signing below, I certify to the best of my knowledge, information, and belief that this Complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the Complaint otherwise complies with the requirements of Rule II.


For Parties without an Attorney

Petitioner 1:

I agree to provide the Clerk's Office with any changes to my address where case-related paper may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: _Aug. 19, 2024_

Signature of pro se Petitioner: _BTS_

Printed name of pro se Petitioner: Bor-Tyng Sheen

U.S. service / mailing address: 5709 Big Sandy Drive, Raleigh, NC 27616-5751


Petitioner 2:

I agree to provide the Clerk's Office with any changes to my address where case-related paper may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: _July 31, 2024_

Signature of pro se Petitioner: _Cheng_

Printed name of pro se Petitioner: Cheng-Yu Wei

U.S. service / mailing address: 5709 Big Sandy Drive, Raleigh, NC 27616-5751

Petitioner 3:

I agree to provide the Clerk's Office with any changes to my address where case-related paper may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: _____ July 31, 2024 _____

Signature of pro se Petitioner: _____ Yuan _____

Printed name of pro se Petitioner: Fung-I Yuan

U.S. service / mailing address: 5709 Big Sandy Drive, Raleigh, NC 27616-5751


Petitioner 4:

I agree to provide the Clerk's Office with any changes to my address where case-related paper may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: _____ July 31, 2024 _____

Signature of pro se Petitioner: _____ TKL _____

Printed name of pro se Petitioner: Tzu-Kuan Lin

U.S. service / mailing address: 5709 Big Sandy Drive, Raleigh, NC 27616-5751


Petitioner 5:

I agree to provide the Clerk's Office with any changes to my address where case-related paper may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: _____ July 31, 2024 _____

Signature of pro se Petitioner: _____ Yang _____

Printed name of pro se Petitioner: Wen-Wang Yang

U.S. service / mailing address: 5709 Big Sandy Drive, Raleigh, NC 27616-5751


Petitioner 6:

I agree to provide the Clerk's Office with any changes to my address where case-related paper may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: _____ Aug. 19, 2024 _____

Signature of pro se Petitioner: _____ Pei _____

Printed name of pro se Petitioner: Yi-Pei Shih

U.S. service / mailing address: 5709 Big Sandy Drive, Raleigh, NC 27616-5751